IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CR-223-WKW |
| | ) | [WO] |
| ROBERT MITCHELL CASTLE | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

A twelve-year old boy sits at a child's excuse for his window to world—the screen of his PlayStation Portable—in a house in a small town in rural Alabama in 2010. He had earlier overheard other sixth grade boys discussing something he knows nothing about, indeed, cannot even imagine. His mind is a *tabula rosa* on the topic of naked bodies and why it would be exciting or intriguing to see and thus experience such a thing. But this kid is not like other boys: Just two years ago, in the fourth grade, his teacher and classmates reported that at times they could not understand the boy's oral communication, or attempts at it. He is and has been since the first grade operating under an independent education plan, shorthand IEP, to mask his learning disability. He is isolated on a social island, with only one friend worthy of the title and with whom he can share any journey into the unknown. For his entire educational career, which will end with a very thin high school diploma in 2016, he will be assisted with extra time for testing, a safe room in which to study quietly, graciously soft grading,  and accommodations for language difficulties. But

he does not fully comprehend his circumstances.  Right now, he thinks he needs to explore the topic that is endemic, perhaps pandemic, in today's culture: pornography, more specifically, internet pornography.

This week, 15 years later, an autistic adult who works at a grocery store and lives with his parents in the same house, faces a nearly 10-year sentence for his activities in the dark world of internet pornography, specifically illegal child pornography.  He has dodged a potential calculated sentence of 90 years on five felony counts, due to the accommodation of the United States government in acknowledgement of his disabilities, including a diagnosis of autism spectrum disorder (ASD).  But it's the same boy, now a grown man who is the subject of intense public scrutiny for reprehensible activities that were birthed in the sixth grade.  His name is Mitch Castle.

Mr. Castle was first identified by the Federal Bureau of Investigation (FBI) in November 2017 as a potential child pornography user.  He was interviewed in June 2018 and indicted at the end of October 2020 for offenses occurring in April 2017, three-and-a-half years earlier, and in June 2018, more than two years earlier.  The offenses related to the receipt, distribution, and transfer of child pornography.

Since his arrest, he has been on uneventful, supervised pretrial release another fifty-six months, including two years on successful home confinement with electronic monitoring.  There is no evidence of any illegal activity by Mr. Castle in the last six years, and Mr. Castle has no prior criminal history.

In March 2022, Mr. Castle pleaded guilty to a single count of transferring obscene material to a minor in violation of 18 U.S.C. § 1470. (Docs. # 48, 50.) This charge stems from his use of a cell phone in June 2018 to trade child pornography images with others, including some who anonymously claimed to be minor teenagers, through an online messaging account he created when he was 14 years old. (*See, e.g.*, PSR ¶¶ 8, 13.)

The plea was entered pursuant a Rule 11(c)(1)(A) and (c)(1)(B) plea agreement with the Government. The Government agreed to recommend a sentence not exceeding the midpoint of the guidelines range and to recommend full acceptance of responsibility. (Doc. # 48.) The United States Probation Office prepared the presentence report (PSR), determining that the guideline range was 120 months based on the statutory maximum for the offense of conviction, with a supervised release period ranging from one to three years.[1] (Doc. # 104 at 4); § 1470 (Class C felony). The fixed range of 120 months effectively nullified the government's offer to recommend a midpoint sentence.

On July 23, 2025, after extensive prior proceedings where evidence was presented, Defendant's sentence was imposed, and two pending matters were addressed. First, on the Government's previously granted motion for an additional

---

[1] Given the guideline range of 120 months, one interpretation of the plea agreement is that the Government agreed to recommend a sentence of sixty months. However, this is not the position for which the Government advocated. (Doc. # 105 at 3–4.)

reduction in Defendant's offense level (Doc. # 80), the recalculated guideline sentence became 106 months. Second, Defendant's motion for a downward sentencing variance (Doc. # 70) was granted. With these matters resolved, Defendant was sentenced to time served and the statutory maximum of three years of supervised release. Arriving at this sentence, the court meticulously evaluated the arguments presented and the large volume of evidence, considered the pertinent statutory factors, and assessed the unique circumstances of this case. This opinion addresses the court's reasons for granting a downward variance from the advisory sentencing guidelines.

## II.  DISCUSSION

To impose a sentence outside the advisory guideline range, the sentencing court must consider the factors set forth in 18 U.S.C. § 3553(a). However, "the court is not required to give all of the § 3553(a) sentencing factors equal weight." *United States v. Howard*, 28 F.4th 180, 205 (11th Cir. 2022) (citation omitted). "In its sound discretion, the court may give great weight to one factor over others, but only if it is reasonable to do so." *Id.* (internal citation and quotation marks omitted). Additionally, while the sentencing guidelines are only advisory, "a major variance from the guidelines range 'should be supported by a more significant justification than a minor one,' and a court must 'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).

These § 3553(a) factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. The court also must consider the applicable sentencing range, pertinent policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims. The court's consideration of these factors, with greater weight given to the history and characteristics of the Mr. Castle, provides compelling justification for a sentence of time served. Here is the court's analysis of the § 3553(a) factors.

### A.    Nature and Seriousness of the Offense

The nature of the offense, *see* PSR ¶¶ 6–15, speaks for itself, weighing against Mr. Castle. The non-production offense conduct is undeniably serious, again weighing against Mr. Castle. *See* § 3553(a)(1), (a)(2) (A).

### B.    Circumstances of the Offense

A twelve-year-old boy hears about pornography for the first time from other sixth-grade boys and begins to investigate with his only friend. Over the next three to four years, the internet investigation results in sexual exploration between the two boys and an ever-deeper dive into pornography on the internet, eventually child pornography. The friend detours to interest in the opposite sex, but the defendant

5

continues his dark journey alone, literally living a double-life. By the time he is 18 years old and graduates from high school, he is deeply committed to chats, sharing images (including of himself), extensive searches, even administering at least one chat room, and living a double-life in the same house he has always lived in. There is no evidence or even suggestion of his actual touching a minor illegally. Approximately one year after graduation, in 2017 when Mr. Castle is 19 years old, the FBI identifies his conduct as illegal and notifies local authorities. A search ensues over a year later in June 2018, when Mr. Castle is 20 years old. He admits his conduct, though he lamely attempts to minimize it, and here begins the present journey. There is no evidence of offense conduct after June 2018, his twentieth year, when all his devices were seized. He is indicted and arrested in October 2020, 41 months after the charged offense conduct.

The number of images charged is small as these cases go: six videos (each counting as 75 images, for a total of 450 images) and six actual images, totaling 456 images. (PSR ¶ 27.)

While the offense is serious and the nature of the conduct weighs against Mr. Castle, the unreasonable delay in prosecution erodes the principle of celerity in criminal accountability, and weighs significantly, but not heavily, against the government. Overall, the offense conduct weighs against Mr. Castle. *See* § 3553(a)(1), (a)(2)(A),

**C.    Need to Provide Punishment for the Offense that is Just**

When laws are broken and prosecuted by the government, some form of punishment is always necessary, a policy that typically favors the government. However, the focus here should not be solely on the "need" for punishment, but rather on what is "just" given all the circumstances.  That analysis follows in the discussion of other factors, below.

**D.    Need for the Sentence Imposed to Promote Respect for the Law**

A sentence of time served in this particular case is reasonable and adequately promotes respect for the law while providing just punishment.  As noted above, Mr. Castle has no criminal activity since June 2018.  In fact, he has been released on pretrial monitoring, including 16 months of electronic monitoring since November 3, 2020, with no issues or violations.  Serving 56 months on supervision with no issues not only demonstrates a strong respect for the law but foretells a successful term of court supervision in the future and registration of sex offenders in the long term.

Additionally, Mr. Castle has officially accepted responsibility for his crimes, further demonstrating his respect for the law.  His counselor's report indicates that he has shown significant remorse for his actions and has made substantial progress in disavowing such conduct in the future.  (Doc. # 68-1, at 27.)  Mr. Castle also has demonstrated his respect for the law through his full compliance with the many

conditions of pretrial release that have been imposed since his arrest in October 2020.

Given Mr. Castle's full acceptance of responsibility and successful efforts toward rehabilitation, the need for the sentence imposed to promote respect for the law weighs in Mr. Castle's favor.

### E.    The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant (Specific Deterrence)

Section 3553(a)(2)(C) requires the sentencing court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." § 3553(a)(2)(C).  Protection of the public is always in play, and as a general-deterrence policy always favors the government, but that is only part of the analysis: "of [this] defendant" is the issue here.  The Eleventh Circuit has described this factor as "the specific deterrence or incapacitation factor."  *United States v. Irey*, 612 F.3d 1160, 1213 (11th Cir. 2010).  This factor strongly favors Mr. Castle.

Mr. Castle has no criminal history beyond the conviction at issue and has not engaged in any criminal activity for the past six years.  Additionally, Mr. Castle benefits from strong family support, having lived in the same house with family throughout his life.  This stability is further reinforced by a solid job and strong support from his employer. Additionally, extensive medical and psychological evaluations indicate that Mr. Castle's risk of reoffending is low.  (Doc. # 68-1 at 33; *see also* Doc. # 92.)  And "[h]is assessed low risk for future sexual offenses is

mitigated by a number of dynamic variables which indicate a further reduction in his risk." (Doc. # 68-1 at 33.) These considerations collectively support a more favorable view of Mr. Castle in terms of public protection. Furthermore, the United States Probation Office's supervision of Mr. Castle while he is on supervised release will serve adequately as a deterrent to future misconduct, while allowing him to continue treatment, which has proven effective, and to contribute positively to society.

The government's primary argument seems to advocate for Mr. Castle's imprisonment purely for punishment's sake. However, this argument for punishment by imprisonment collapses under the weight of the evidence.

### F.    The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct (General Deterrence)

Sections 3553(a)(2)(B) requires the sentencing court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." General deterrence focuses on discouraging the broader public from engaging in criminal conduct by demonstrating the consequences of such actions. Deterrence of other potential offenders is a strong policy consideration in every prosecution. This factor almost always favors the government, as it does here and in every case involving the prosecution of child pornography offenses. *See United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (holding that general deterrence is "particularly compelling in the child pornography context").

### G.    History and Characteristics of Defendant

Section 3553(a)(1) requires consideration of the "history and characteristics of the defendant," which is the heart of the § 3553(a) factors in Mr. Castle's case. This factor weighs heavily in his favor.  It is also the factor with by far the greater weight of the evidence, which is consistent with the government's recognition of the disabilities of Mr. Castle.  It is informed by extensive expert testimony rarely seen in sentencings in this district (not seen in any sentencing of an autistic person in this judge's experience), and is refuted only in argument by the government, unsupported by expert testimony.

Finally, these considerations are findings of fact based on credible testimony, in some cases challenged by the government.  As in each factor, the court has considered all the arguments of counsel, the presentence report and advice of probation,  and all the credible evidence before it in arriving at these conclusions.

*Age of Defendant.*  The April 17, 2017 conduct referenced in paragraph 10 of the PSR occurred soon after Mr. Castle's nineteenth birthday.  The chats and other conduct referenced in paragraphs 12 and 13 occurred in June 2018.  There is no evidence in the record of any criminal activity by Mr. Castle after his interview with government agents on June 28, 2018.  Indeed, that makes sense in that he was confronted with the government's findings and accusations in the June 28 interview, at the age of 20 years, 4 months.

The great weight of evidence recited in paragraphs 9 and 11 of the PSR, which ascribe no dates whatsoever, occurred most likely when Mr. Castle was a minor. At least there is no evidence that the bulk of it occurred in the two months after he reached majority. Paragraph 10, already mentioned, occurred 2 months after he had reached majority.

Furthermore, a defendant's youth, as now memorialized in the Sentencing Guidelines as a policy statement, is a factor for consideration because it provides important context for understanding a defendant's criminal behavior.[2] *See* U.S.S.G. § 5H1.1 Age (Policy Statement); *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) (explaining that younger offenders "have lessened culpability" and are "more capable of change" relative to fully developed adults). It stuns the imagination to tag a 20-year-old with offenses for years of conduct as a minor on the internet that result in a 90-year guideline. Any system of calculation that leads to that result is facially unreasonable. Guideline 2G2.2 has been deeply criticized for its inflexible inability to distinguish between more and less culpable offenders. As noted by Mr. Castle's sentencing memorandum (Doc. # 74), the guideline applicable to § 1470,

---

[2] The Sentencing Guidelines recognize that youthful individuals often exhibit traits such as impulsivity, curiosity, and susceptibility to peer influence, which can contribute to criminal conduct. These traits are typically associated with the developmental stage of youth, where decision-making capabilities still are maturing. As a result, youth is seen as an encouraging sign for corrective change, as younger individuals are generally more amenable to rehabilitation. U.S.S.G. § 5H1.1. This policy statement acknowledges that with appropriate intervention and support, young offenders have a greater potential for reform. *Id.* There is substantial credible evidence here to confirm this policy statement.

absent application of § 2G2.2, would be 30 to 37 months. Ninety years is more than a multiple of 30 of what the Sentencing Commission found to be a reasonable § 1470 sentence.

That all of this landed in the file of a 20-year-old offender, the bulk of whose criminal conduct occurred during his minority, supports a significant variance.

***Disabilities of Defendant***. The government does not dispute Mr. Castle's disabilities, including those resulting from autism spectrum disorder. The disabilities, including significant mental health issues, are firmly acknowledged by the government in both the plea agreement (Doc. # 48) and the government's sentencing memorandum (Doc. # 79), as well as orally at various hearings. The only dispute is the extent of the disabilities which, as in any case, can be quibbled over. But beyond the extent issue, which is hard to measure, the results of the disabilities are measurable. A 12-year school career on IEP, assisted test-taking, alternative quiet space to enhance learning, and other accommodations; diagnoses of three highly qualified medical specialists; and the credible testimony of two experts (Malone and Babcock) all confirm characteristic Mr. Castle's deficiencies that mitigate against a long sentence. A third is an assessment in the record by Brie A. Imhof, a licensed clinical psychologist, dated January 22, 2022, which the court finds credible. This assessment contains an extensive, detailed plan for treatment that Mr. Castle and his family appear to be following.

Dr. Imhof says that both Dr. Malone and Dr. Babcock report "a profound sense of remorse" from Mr. Castle for the offense behavior. (Doc. # 68-1, at 27.) As of January 2022, Dr. Malone had conducted over 30 counseling sessions with Mr. Castle and his entire family in the treatment process, consisting of direct therapy sessions, family education, "check-ins," and sex offender treatment. The court understands from counsel that Dr. Malone has continued contact with Mr. Castle up to the present. (It is reported that Dr. Babcock recently passed away, and that the Castle family is searching for a replacement counselor with the assistance of Dr. Malone.)

Dr. Imhof recites Mr. Castle's disabilities from autism as:

(1)     Significant challenges with social communication and interaction;

(2)     He was unable to articulate meaningful strategies for self-help or self-care that most adults of his age can readily access (Doc. # 68-1, at 20);

(3)     He has difficulty using language in ways that connect him to others, including difficulty understanding language, context and gestures, nuances and possible motives, and the wishes of others.

Dr. Babcock adds: "I think the almost complete absence of that executive functioning ability explains why he scored so poorly in his communication." (Doc. # 104 at 14.) Having administered the Vineland Adaptive Behavior Scale Test, Dr. Babcock found:

13

In summary, Mitch Castle's age-equivalent levels of functioning in the areas of receptive communication, expressive communication and interpersonal relationships are 3 years 4 months, 3 years 7 months, and 4 years 4 months respectively. These weak areas reflect extremely severe deficits in social cognition and executive functioning skills result[ing] from his autism spectrum disorder. His deficits in social cognition contrast markedly with his strengths in other areas of daily living skills, with age equivalents ranging from 17 years 9 months to above 22 years of age, which to the casual observer make Mitch appear to be much more capable than he actually is when engaging with people in unsupported social contexts.

(Doc. # 94-2, at 3–4.)

A similar, but layman's, view of Mr. Castle's disabilities appears in the affidavit of his employer, Walter Cannon. (Doc. # 103-52.) While Mitch is honest, dependable, and on time, he has limitations. For instance, he requires step-by-step instructions: "In my experience with Mitch, he does not think in the abstract or use reasoning and logic as most people can. . . . Mitch would not be able to work on the cash register. The cash-out transactions are each unique, different from the previous cash-out, and Mitch would likely be overwhelmed." (Doc. # 103-52 at 1–2.)

Dr. Babcock further explained that Mr. Castle "suffers from moderate levels of depression, despite psychiatric medication and ongoing therapy efforts to address depression using empirically-based treatment," and he emphasized that any disruption in this treatment should be avoided. (Doc. # 103-54 at 4.)

In sum, Mr. Castle's history of learning disabilities, social isolation, communication deficiencies, language and math deficiencies, lack of any

meaningful executive function skills, and depression and anxiety, all suggest he will not fare well while incarcerated.

### H.    Provision of Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment

As already noted and as a finding of fact, Mr. Castle has had extensive and very effective counseling, psychological treatment, and training over the last five years, and these therapies continue to the present (subject to the family's success in locating a counselor to replace Dr. Babcock). He has shown a commitment to personal development, and treatment has resulted in favorable outcomes. Since early 2021, Mr. Castle has participated in biweekly therapy with a clinical therapist, Deegan Malone, and weekly therapy with behavior analyst and licensed psychologist, Dr. Bob Babcock.[3] His therapy has focused on building skills that are absent due to his ASD and on understanding appropriate sexual behaviors. In addition, he qualified for and completed the sixteen-week PEERS program for young people with ASD. The United States Probation Office, as directed by the court, will facilitate access to necessary resources and support, including continued treatment for mental health, autism spectrum disorder, and sex offenders.

There appears to be no meaningful treatment program in the Bureau of Prisons specifically for a person with Mr. Castle's multiple disabilities. It is therefore

---

[3] Therapy with Dr. Babcock continued until his recent death.

reasonable to conclude that to provide him with needed educational and medical care, his present circumstances should not be interrupted by incarceration in a general federal prison population; that would be the least effective alternative.

On the other hand, the last "need" suggested in this § 3553(a) factor is "other correctional treatment," also "in the most effective manner." § 3553(a)(2)(D). The court finds that, based on Mr. Castle's unique circumstances, the need for treatment would be best served outside prison walls and the most effective correctional treatment under all the circumstances is not incarceration (which the court finds is the least effective alternative). Harking back to the need to provide "just" punishment, the court finds that, under all the § 3553(a) factors, the only just punishment is continuation of supervision *in situ*—not a full shutdown of not only demonstrably effective treatment but several of the other "dynamic variables" (employment, home, family, and community support, *etc.*). (*See* pages 8–9, *supra*, and Doc. # 68-1 at 33.) What is "just" is also what is "needed" here.

Furthermore, it is important to note that Mr. Castle will be strictly supervised under Alabama's draconian sex offender regulations for life during and after he finishes whatever term of supervision ordered by this court.

***Family and Community Support.*** On the other hand, and strongly in his favor, is the overwhelming family and community support for Mr. Castle. His family has gone above and beyond any reasonable expectations to provide a loving home, to secure and even attend counseling with and for him, to accept him and love

him even in the face of shocking evidence of his debauched secret life during his teenage years. The same goes for his extended community and even his employer, who submitted both a statement and an affidavit in support of Mr. Castle.

*Stable Residence and Employment.* Mr. Castle is secure in his home situation, which will not likely change whether he is incarcerated or not. As noted above, his employer firmly stands behind him, despite his recognized disabilities.

*Vulnerability in Incarceration.* There are two factors at play here. First, there is no evidence that the Bureau of Prisons has any program directed to treatment of persons on the autism spectrum. In fact, the evidence lies on the opposite shore: All indications are that Mr. Castle will be placed in the general prison population. That points to the second factor: Because of his communication-processing disabilities, mental health issues, and personality traits, Mr. Castle is very likely to suffer abuse at the hands of other prisoners if incarcerated: "In a jail or prison setting where social hierarchies and power/control among inmates plays an important role in survival, a socially challenged individual such as Mr. Castle, would be an easy target for physical and sexual abuse." (Doc. # 68-1 at 21.) Additionally, as Dr. Babcock explained in great detail but which is summarized here: "If Mitch is sentenced to incarceration in federal prison, he will be at extremely high risk for victimization, due to his deficits in social cognition, his inability to accurately perceive other's motives and perspectives, and due to the nature of the offense." (*See also* Doc. # 94-2 at 4.) "Effective efforts to protect him will likely require

17

protective segregation[,]" but that segregation likely would result in "much more significant psychiatric deterioration." (Doc. # 103-54 at 5.)

In the absence of any evidence whatsoever from the government contradicting these opinions, this factor works significantly against the government and, along with the absence of treatment for impaired persons like Mr. Castle, reduces or eliminates meaningful residential incarceration options in a case like this.

## I.    Sentencing Range and Policy Statements

The advisory sentencing guidelines suggest a sentence of 120 months, which has been reduced to 106 months after the grant of the Government's motion. However, the unique circumstances of this case, as have been laid out at length, with greater emphasis on Mr. Castle's history and characteristics, compellingly justify a variance to a sentence of time served. This sentence also considers the Sentencing Commission's policy statements on age, as described above, applying it as relevant to the specific facts of this case. U.S.S.G. § 5H1.1. Given that Mr. Castle's youth is relevant to both his criminal behavior and his risk of recidivism, this policy statement weighs in Mr. Castle's favor.

## J.    Avoidance of Unwarranted Sentencing Disparities

This factor requires, first, other defendants; second, a sentencing disparity that necessarily captures the same or very similar circumstances as other defendants; and third, the disparity must be "unwarranted." § 3553(a)(6). This factor is neutral.

18

First, the undersigned has sentenced an unknown but large number of defendants in the realm of child pornography offenses, including hands-on offenders who got well over 40-year sentences, and one who had written a book on how to buy, transport, and abuse young girls in Pacific island nations, and who, as recalled, received a 400-month sentence.

Second, this court has sentenced at least four other child pornography offenders (probably more) who were diagnosed with autism of some sort, but notably, none with the severe history and characteristics of Mr. Castle, as discussed extensively above. Specifically, the court is unaware of any child pornography case in this district that relies heavily on the criminal conduct of a defendant while a minor. The court finds no sentencing disparity.

Notable also, granting a downward variance to time served aligns with sentences imposed by two other district judges in cases involving child pornography offenses by defendants diagnosed with autism spectrum disorder. *See, e.g.*, *United States v. Knott*, 638 F. Supp.3d 1310 (M.D. Ala. 2022) (Thompson, J); *United States v. Huseth*, 2021 WL 4940915 (D. Kan. Oct. 22, 2021) (Robinson, C.J.).

### K.    Restitution to Victims

Mr. Castle has agreed to make full restitution to any victims (Doc. # 48 at 4, ¶ 9), further demonstrating his commitment to taking responsibility for his actions. To date, no victim has requested restitution, and, thus, there is not an identifiable victim who incurred a financial loss as a result of Mr. Castle offense. Mr. Castle has

been ordered, however, to make restitution to the Crime Victim Fund in the amount of $5,000. This factor thus has some bearing in the court's analysis. § 3553(a)(6).

### III. CONCLUSION

If this case were a novel, it should be titled, "From Play Station to Penitentiary." Due to the age of Mr. Castle when the core of his criminal activity was organized, and the bulk was executed, and in view of his disabilities, this case is unique in that it falls outside the mainstream of child pornography cases. The court exercises its judgment to treat it as such.

A final point warrants emphasis. In its analysis of the § 3553(a) factors, the court has not misidentified Mr. Castle as the victim. He plainly is not. The court acutely is aware of the profound and enduring harm inflicted upon the real victims of child pornography offenses perpetrated by criminals, including Mr. Castle. (*See* PSR ¶¶ 16–17.) These victims, often the most vulnerable members of society, suffer lasting psychological and emotional trauma, and their exploitation no doubt leaves indelible scars. (PSR ¶ 17.) The court recognizes the critical importance of acknowledging this harm, not only to validate the victims' experiences but also to underscore the gravity of Mr. Castle's conduct.

For the reasons stated above, the court finds that a substantial downward variance in Mr. Castle's sentence to time served with three years' supervised release is an appropriate and reasonable sentence. Mr. Castle's unique circumstances, when

evaluated alongside the § 3553(a) factors, and with particular emphasis on his history and characteristics, provide a compelling justification for this sentence.

DONE this 23rd day of July, 2025.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE